IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PATRCIA LUKSIC o/b/o JARED VIA, | ) | Case No. 1:23-cv-1139 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Patricia Luksic, on behalf of her deceased son, Jared Via, seeks judicial review of the final decision of the Commissioner of Social Security, denying her son's application for disability insurance benefits ("DIB") under Title II of the Social Security Act.[1]  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 8.  Luksic asserts only one assignment of error: that the Administrative Law Judge ("ALJ") failed to apply proper legal standards when he implicitly rejected certain limitations in Dr. Weaver's opinion and/or rejected Dr. Weaver's opinion without a discussion of the factors required under the regulations. Because the ALJ applied proper legal standards in the evaluation of Dr. Weaver's treatment instructions, the Commissioner's final decision denying her son's application for DIB must be affirmed.

---

[1] In response to the court's March 15, 2024 show cause order (ECF Doc. 14), Luksic provided sufficient evidence to establish her standing to bring this action on behalf of Via.  ECF dkt. entry dated Mar. 15, 2024; *see* ECF Docs. 15, 15-1, 15-2.

## I.    Procedural History

On June 9, 2021, Via filed an application for DIB and SSI.  (Tr. 19, 265).  Via alleged a disability onset date of March 24, 2020, (Tr. 19, 69, 72, 175), and asserted that he was disabled due to complex regional pain syndrome and severe arthritis in his right foot, (Tr. 54, 61, 223).  His application was denied initially and upon reconsideration.  (Tr. 54-59, 61-66).  He then requested a hearing.  (Tr. 98-103).  On August 1, 2022, ALJ Peter Beekman heard the matter, (Tr 35-51), and denied Via's claim in a September 20, 2022 decision, (Tr. 19-30).

On October 12, 2022, the Appeals Counsel was informed that Via had passed away. (Tr. 10).  On November 23, 2022, Luksic filed a notice regarding substitution of party upon death of claimant, in which she indicated her intent to be made a substitute party going forward. (Tr. 52).  On April 19, 2023, the Appeals Council denied further review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-11).  The Appeals Council dismissed Luksic's request pursuant to 20 C.F.R. §§ 404.971(b) and 416.1471(b), in part, because there was no survivor or other qualified person adversely affected who wished to proceed.  (Tr. 10). On June 7, 2023, Luksic filed a complaint to obtain judicial review.[2]  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Via was born on December 24, 1980 and was 40 years and 5 months old on the alleged onset date.  *See* (Tr. 54, 61, 69, 72, 181, 209).  Via had a high school education, (Tr. 28, 38, 224, 265), and had past work as a CNC setup operator, CNC grinder, and CNC Swiss lathe operator, (Tr. 45-46, 58, 65, 211).

---

[2] If a claimant dies before he receives an underpayment of DIB, enumerated class members (surviving parents, spouse, and children) are eligible for a deceased claimant's benefits and have standing to pursue payment of the deceased claimant's benefits.  *See* 20 C.F.R. § 404.503(b); 42 U.S.C. § 404(d); *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 247 (6th Cir. 1995).

### B.    Medical Evidence

On March 20, 2020, Via had an initial patient evaluation with a podiatrist, Robert Weaver, DPM, for pain and discomfort in his right foot that had persisted off and on since sometime in the previous year.  (Tr. 274).  Via complained of a lot of swelling and discomfort during the day and when ambulating.  (Tr. 274).  X-rays of his right foot demonstrated no sign of stress fracture or Charcot difficulty but indicated early signs of a stress fracture requiring an MRI.  (Tr. 275).  Dr. Weaver ordered an MRI and assessed Via with pain, swelling, and joint pain in his right foot.  (Tr. 275).

On April 15, 2020, Via had a follow-up appointment with Dr. Weaver during which he complained of continued pain and discomfort without improvement.  (Tr. 277).  Dr. Weaver assessed Via with Charcot's joint of the right foot, a closed nondisplaced fracture in his right foot, and right foot pain.  (Tr. 278).  Dr. Weaver recommended that Via stay in a walking boot at all times and limit weight bearing.  (Tr. 278).  On April 22, 2020, Via saw Dr. Weaver, reported a lack of improvement, and stated he had been walking in his walking boot.  (Tr. 280).  The MRI of Via' rights foot demonstrated advanced arthritis of the midfoot with edema, mild joint space narrowing, chondromalacia, very small marginal osteophyte formation, and possible subcortical erosions.  (Tr. 281).  CT results were vague and demonstrated some diffuse, moderate demineralization, no fracture or healing fracture, and diffuse osteoporosis.  (Tr. 281).  Dr. Weaver ordered a bone scan and directed Via to continue using his walking boot.  (Tr. 282).

On May 5, 2020, Via returned for a review his bone scan; Dr. Weaver diagnosed: (i) a closed nondisplaced fracture of second metatarsal bone of right foot with routine healing; and (ii) a Charcot deformity of unknown etiology.  (Tr. 283-285).  Dr. Weaver found Via to have no diabetes and a normal neurological examination.  (Tr. 285).  Via's right leg was placed into a

non-weightbearing below-the-knee fiberglass cast and he was asked to return for reevaluation in seven weeks.  (Tr. 285).

On June 10, 2020, Via saw Dr. Weaver, complaining of leg swelling and pain; he also presented with a worn out and broken apart cast.  (Tr. 287).  Dr. Weaver noted that Via had: (i) personally taken the top part of the cast off; and (ii) "obviously been doing some walking on the cast because the bottom was blown out."  (Tr. 287).  Via reported that his foot pain had improved somewhat but it was still painful during the swelling portion of the day.  (Tr. 287).  Dr. Weaver recommended that Via be placed in a second cast to maintain at least six-to-eight weeks of non-weightbearing but Via refused.  (Tr. 289).  Via had brought a pneumatic walker to the appointment and stated that he would be compliant and stated that he was not working.  But Dr. Weaver warned Via that walking or even resting on his foot could cause further difficulty and exacerbate his Charcot deformity.  (Tr. 289).  Finally, Dr. Weaver noted: "Today against my better judgment and against medical advice I allowed him to go with a pneumatic Cam walker per his persistant [sic] request.  I instructed him to remain absolute non[-]weightbearing [and] elevate his foot at all times."  (Tr. 289).

On June 17, 2020, Via saw Dr. Weaver and reported that he had been compliant with walking and non-weightbearing with his crutches and Cam walker.  (Tr. 291).  Dr. Weaver noted early signs of Charcot deformity and ordered an EBI bone stimulator.  (Tr. 291-293).  On July 15, 2020, Via saw Dr. Weaver and stated that he had been both walking with crutches and compliant with non-weightbearing instructions.  Via reported that he was feeling better and was not nearly as swollen as before.  (Tr. 294).  Dr. Weaver indicated that he wanted Via to remain non-weightbearing on his right foot for an additional month (Tr. 294).

On August 12, 2020, Via saw Dr. Weaver, presenting with pain in his right foot and ankle, which he reported was as bad as before.  (Tr. 298).  He stated that he had been walking

4

with crutches with a Cam walker on.  (Tr. 298).  Dr. Weaver noted increased warmth and noted
concern over the lack of improvement with the Charcot deformity.  (Tr. 300).  Dr. Weaver
ordered further testing and non-weightbearing for another month.  (Tr. 300).

On September 2, 2020, Via saw Dr. Weaver and reported that he was feeling improved;
his swelling was much better, and he had been ambulating in his Cam walker.  (Tr. 302).  On
September 13, 2020, Via saw Dr. Weaver and he presented with pain that was not much reduced
from his last visit; and he was also ambulating in a fairly flexible tennis shoe.  (Tr. 306).  Dr.
Weaver noted that the source of Via's pain was not fully determined but was likely due to a
degenerative joint disease, Charcot, or an osteoarthritic condition.  (Tr. 307).  Via was
additionally assessed with acute idiopathic gout of the left foot, plantar fasciitis, and posterior
tibial tendon dysfunction of the right lower extremity.  (Tr. 307-308).  Via was provided custom
orthotics, recommended proper shoe gear, and told to perform physical therapy at home.
(Tr. 307-308).

On February 3, 2021, Via saw Isam Diab, M.D., concerning pain, stiffness, and swelling
in his right foot.  (Tr. 316).  Dr. Diab performed a rheumatology evaluation of the right foot.  Via
complained of pain and difficulty standing for long periods and with walking, but he denied any
"gouty attacks."  (Tr. 316-319).  Dr. Diab diagnosed Via with, among other things, complex
regional pain syndrome and osteoarthritis.  (Tr. 317).  Via's physical examination demonstrated
diffuse swelling of the right foot with cold skin.  (Tr. 319).  Dr. Diab noted that these symptoms
were highly consistent with reflect sympathetic dystrophy syndrome and "suggestive of trophic
changes in association with sympathetic dystrophy syndrome."  (Tr. 319).  At a follow-up with
Dr. Diab on March 29, 2021, Via reported the same pain in his foot as the last visit.  (Tr. 321).

On May 14, 2021, at a rheumatology consultation with Janice Graieri, M.D., Via
complained of swelling and pain in his right foot and ankle.  (Tr. 383-384).  Dr. Graieri's

impressions included: (i) no acute osseous injury of the right ankle or foot; (ii) degenerative changes; and (iii) scattered indeterminate lucencies throughout the right ankle or foot.  (Tr. 388). Dr. Graieri noted that Via's pain was severe, that he could barely walk, and that he was using ambulatory aids.  (Tr. 388).

On June 2, 2021, Via saw Marl Berkowitz, M.D., for his right foot pain.  (Tr. 375).  A review of Via's systems was unremarkable, and his physical examination revealed no acute distress.  (Tr. 376).  X-rays of Via's right ankle and foot demonstrated significant diffuse midfoot joint narrowing and osteopenia, but his joint space was maintained, and he had intact hardware. (Tr. 377).  Dr. Berkowitz assessed Via with right midfoot arthritis, noted he was not diabetic, and ordered a carbon fiber shoe stiffening insert.  (Tr. 377).  On June 7, 2021, Via saw Juliette Yedimenko, M.D., presenting with pain in his right foot.  (Tr. 369-370).  A review of Via's systems and his physical examination were unremarkable, save for right dorsal foot swelling and tenderness to palpation without associated redness or warmth.  (Tr. 370-372).

On June 23, 2021, Via had a chronic pain consultation with Shirf Costandi, M.D. (Tr. 362).  Via reported that the pain in his right foot was a constant, aching pain that was a 4/10 on the best day and 9/10 on the worst, with the current day being a 5/10.  (Tr. 363).  He further reported that the pain was worsened by standing and walking and alleviated by sitting.  (Tr. 363). A review of Via's systems and physical examination were unremarkable, with normal reflexes, motor strength, sensation, and gait.  (Tr. 364-365).  Dr. Costandi assessed moderate to severe midfoot osteoarthritis, dorsal soft tissue swelling, and midfoot arthritis.  (Tr. 365).  Dr. Costandi recommended physical therapy, Tylenol, and steroid injections for pain management.  (Tr. 365).

On July 2, 2021, Dr. Costandi administered a right talo-navicular steroid injection and noted no complications.  (Tr. 1003).  On July 29, 2021, Via saw Dr. Yedimenko and reported

6

that he felt a 30-40% improvement in his pain after the steroid injection.  (Tr. 993).  Via reported he was still unable to walk normally, and his pain was a 4/10.  (Tr. 993-994).

On August, 17, 2021, Via saw Dr. Costandi and reported that his pain had been improving, with the pain currently at 3/10.  (Tr. 973).  A review of Via's systems and his physical examination were unremarkable, with normal strength, sensation, and gait.  (Tr. 973-975).  Dr. Costandi continued with a conservative course of treatment (physical therapy, Tylenol, etc.).  (Tr. 975).  On August 24, 2021, an MRI of Via's right foot and ankle revealed severe osteoarthritis of the talonavicular joint, with joint space narrowing, subchondral cystic change, adjacent dorsal soft tissue swelling, and moderate to severe osteoarthritis of the TMT joints. (Tr. 435-436).  The tendons, plantar plates, Lisfranc ligament, and muscles all appeared normal and intact.  (Tr. 435-436).

On September 3, 2021, Via was administrated a right lumbar sympathetic nerve block by Dr. Costandi.  (Tr. 587).  On October 8, 2021, Via saw Dr. Yedimenko and reported that: (i) the spinal nerve block had helped with his foot pain for three days but then it worsened; (ii) his pain that day was a 4/10; and (iii) his foot was swollen and sometimes had purple discoloration. (Tr. 563).  Dr. Yedimenko noted that Via had significant ongoing functional impairment and recommended an increase in medication and a follow-up in three months.  (Tr. 566-567).

On October 20, 2021, Via saw Dr. Costandi.  (Tr. 950).  Via's physical examination demonstrated that his right foot was swollen and discolored and that he had an antalgic gait, but he displayed full reflexes, motor strength, and sensation.  (Tr. 951).  It was noted that Via had recently played golf.  (Tr. 950).  On November 22, 2021, Via saw Elizabeth Kirchner, APRN CNP, who noted that he exhibited a limp and was in significant pain.  (Tr. 941-943).  Via's examination demonstrated joint pain, joint swelling, and leg swelling.  (Tr. 942).

7

On December 2, 2021, Via saw a chiropractor, Thomas Torzok, D.C., for his lower back pain, and he was diagnosed with chronic bilateral low back pain without sciatica.  (Tr. 519).  On December 6, 2021, Via underwent a dorsal root ganglion ("DRG") spinal cord stimulator trial.  (Tr. 935-936).  On December 13, 2021, Via saw Dr. Costandi regarding his foot pain, the removal of his stitches and the DRG lead.  (Tr. 931).  Dr. Costandi noted that Via had obtained 60% pain relief from the DRG stimulator.  (Tr. 931).  A review of Via's systems and his physical examination were unremarkable, with normal extremity strength, sensation, and gait.  (Tr. 932-933).  Via decided to proceed with the permanent implant of the DRG stimulator.  (Tr. 933-934).  On December 30, 2021, Via saw Dr. Yedimenko and confirmed that he had a 60% reduction in pain with the DRG stimulator and that his swelling had decreased.  (Tr. 914-915).

On January 25, 2022, Via saw Mariana Iskander, PA-C (Physician Assistant), for a routine history and physical examination, complaining of right food pain.  (Tr. 905).  A review of Via's systems was unremarkable, save for back and lower right extremity pain.  (Tr. 907).  His physical examination demonstrated a swollen right foot with redness/discoloration but was otherwise unremarkable.  (Tr. 907).

On February 17, 2022, Via underwent imaging of his lumbar spine.  (Tr. 897).  The images demonstrated: (i) no compression defects; (ii) degenerative changes in the lumbar spine without acute osseous findings; (iii) chronic appearing L5 defect; and (iv) maintained SI joints with no evidence of significant degenerative or inflammatory arthropathy.  (Tr. 897-898).

On March 22, 2022, X-rays of Via's right ankle and foot demonstrated increased soft tissue swelling and midfoot degenerative changes, but no acute bony abnormality.  (Tr. 989).  At a follow-up appointment with Dr. Costandi on March 30, 2022, Via reported persistent pain that was currently at 8/10.  (Tr. 851).  Via's physical examination revealed some tenderness in the neck and back but demonstrated full range of motion without reproducible pain and no pain on

8

palpation of the lumbar spine.  (Tr. 851-852).  Moreover, his extremities were normal with no deformities, edema, or skin discoloration; and his motor strength, sensation, and gait were also normal.  (Tr. 852).  Dr. Costandi recommended physical therapy, consultation with a psychologist, and continuation of the current regimen of medication.  (Tr. 853).

On April 4, 2022, Via began outpatient physical therapy at Euclid Hospital, with a goal of reducing pain levels and being able to work and walk.  (Tr. 845).  At his second physical therapy session on May 4, 2022, Via continued "to present with impairments in balance, flexibility, gait, independence in exercise, joint mobility, overall function, range of motion and strength that interfere with standing; walking; rising from a chair; stair negotiation; recreational activities; physical activities; working; sleeping."  (Tr. 837).  On May 13, 2022, Via was referred to the emergency department for an ultrasound due to calf swelling, erythema, and tenderness to palpation.  (Tr. 834).  Imaging demonstrated extensive occlusive thrombus of his right lower extremity.  (Tr. 810-811).  On May 18, 2022, Via had a consultation with vascular surgeon, Eric Shang, M.D., concerning the deep vein thrombosis ("DVT") that he was experiencing.  (Tr. 782).  Dr. Shang noted that Via was on anti-coagulation medication, and Via reported some moderate swelling and pain of his right lower extremity.  (Tr. 782).  A review of Via's systems was positive for right leg swelling but negative for joint pain or swelling.  (Tr. 784).  Dr. Shang determined that Via "likely had a provoked DVT secondary to inactivity that embolized to his lungs."  (Tr. 784).

On May 24, 2022, Via saw William Fike, M.D., to establish care and to follow-up after his discharge from the hospital for DVT.  (Tr. 767).  A review of Via's systems was positive for leg swelling, joint pain or swelling, back pain or muscle pain, and fatigue.  (Tr. 770).  The following day, Via had a hematology consultation with Mohammad Varghai, M.D.  (Tr. 763).  A review of Via's systems was positive for chronic low back and right ankle pain, but was negative

for leg swelling or palpitations and negative for joint pain or swelling, back pain, and muscle pain.  (Tr. 763).  His physical examination demonstrated swelling of the right leg with mild tenderness and skin change but also demonstrated that he could walk without assistance and had normal gait.  (Tr. 765).  On June 8, 2022, Via saw Dr. Varghai for a follow-up consultation. (Tr. 693).  A review of Via's systems and his physical examination were unremarkable; and Via exhibited normal gait, with no swelling, discoloration, or tenderness in his extremities.  (Tr. 694-695).

On June 21, 2022, Via saw Dr. Costandi for his foot pain.  (Tr. 681).  Via's physical examination was unremarkable, save for swelling on his midfoot and tenderness over the talo-navicular joint.  (Tr. 681-683).  Dr. Costandi recommended physical therapy, consultation with a psychologist, and continuation with the current medication regimen.  (Tr. 683-684).  On June 24, 2022, Via attended a physical therapy session.  (Tr. 676).  The treatment notes indicated that Via demonstrated no improvement in rising from a chair, walking, or lifting, but also noted that this was his first session in over six weeks.  (Tr. 676).  The treatment notes also indicated that Via's prognosis was fair and that he would benefit from continued therapy sessions.  (Tr. 676).

### C.   Opinion Evidence

#### 1.   State Agency Medical Consultants

On initial review, state agency medical consultant Steve McKee, M.D., reviewed Via's medical record and completed an assessment of Via's physical residual functional capacity ("PRFC").  (Tr. 57-58).  For exertional and postural limitations, Dr. McKee found that Via could: (i) occasionally lift/carry 20 pounds; (ii) frequently lift/carry 10 pounds; (iii) stand/walk for 4 hours in an 8-hour workday; (iv) sit for 6 hours in an 8-hour workday; (v) occasionally climb ramps/stairs; (vi) never climb ladders/ropes/scaffolds; (vii) frequently kneel and crawl; and (viii) occasionally crouch.  (Tr. 57).  At the reconsideration level, Dana Schultz, M.D., reviewed

and affirmed Dr. McKee's medical findings as to Via's exertional and postural limitations. (Tr. 63-64). Dr. Schultz added environmental limitations, finding that Via should avoid all exposure to hazards (machinery, heights, etc.). (Tr. 64).

### 2. Miljan Cecez, P.T.

In August 2021, Miljan Cecez, P.T., completed a PRFC assessment for Via. (Tr. 344-357). In his summary of findings, PT Cecez opined that Via had the ability to perform work at a medium exertional level and could lift between 30-50 pounds, but he should avoid squatting, stair climbing, and walking. (Tr. 344). He further opined that Via had the ability to "work full time while taking into account his need to alternate sitting and standing as noted in this report." (Tr. 344). In the report, PT Cecez opined that Via could stand for up to 55 minutes total during a typical workday and could sit for up to 7 hours and 49 minutes. (Tr. 357).

### D. Testimonial Evidence

### 1. Claimant Jared Via

At the ALJ hearing, Via was asked by the ALJ about becoming disabled on March 24, 2020, and he responded that:

> It wasn't exactly that date; I was fighting through it for a couple months, but that's when I got laid off from work, also, right around when COVID hit, and that's when I started dealing with those doctors for a – a bunch of broken bones in his foot, stress fractures. And that's what – I was trying to work with it, but I was missing work due to it, and that was about the start of everything, trying to get it . . . fixed.

(Tr. 38-39). When asked if he used a cane or walker, Via testified that he used a boot most of the time and that he had crutches, but he didn't use them as much. (Tr. 39). Via testified that he was unable to work because of the immense pain in his foot, for which there was no relief, and he suffered from the following conditions: "Charcot foot, the regional pain syndrome, inflammatory arthritis, [and] hidradenitis suppurativa." (Tr. 39). He testified that he had had surgery on his foot and doctors put "[leads] into his spine" to treat his nerves but they provided

little help.  (Tr. 39-40).  When asked about his typical day, Via testified that he wakes up, does his exercises, physical therapy (if it is scheduled that day), and not much else other than sitting and raising his foot while treating with heat and ice.  (Tr. 40).

Under questioning from his counsel, Via testified that: (i) his foot was the main reason he could not work full-time; (ii) he had issues with his foot before the stress fracture for about two years; (iii) surgery had not helped; (iv) doctors wanted to do more surgery; and (v) he cannot undergo more surgery because he suffers from blood clots, which require blood thinners. (Tr. 40-41).  He further testified that he believed the blood clots were related to his foot; they had started in his legs, and he had been in the ICU for four days with blood clots in his chest and lungs.  (Tr. 41-42).  Via testified that he suffered short-term memory loss as a side effect from his medication and that he goes to physical therapy twice a week – which he stated seemed to help a little bit.  (Tr. 42).

Via testified that he could only walk a couple minutes before having to take a break; he could stand in one spot for only five minutes before his back would start to hurt; and his toes would get tight if he sat for longer than five minutes.  (Tr. 43).  Via confirmed that he did not use a cane but had been using a walking boot for about two years.  (Tr. 43).  He testified that he elevated his foot for about 12 to 15 hours a day.  (Tr. 44).  When asked about social activities, he answered that he could not do anything now because of his pain and could only leave the house for a couple hours.  (Tr. 44).  He testified that he did not have issues getting dressed or bathing, but he did not do household chores.  (Tr. 44-45).

### 2.    Vocational Expert

Brett Salkin, a Vocational Expert ("VE"), also testified.  (Tr. 45-49).  The ALJ posed a hypothetical, asking the VE whether there were any jobs in significant numbers in the national

economy that a hypothetical individual could perform, if that hypothetical individual had Via's

age, work background, education, and the following added limitations:

> [C]an lift/carry 20 pounds occasionally, ten pounds frequently; can stand/walk four out of eight, can sit six out of eight; no limit on push/pull; foot pedal is constant with the left lower extremity, occasional with the right lower extremity; this person can occasionally use a ramp or a stairs, but never a ladder, rope, or a scaffold; can constantly stoop, frequently kneel, occasionally crouch, frequently crawl; there are no manipulative, visual, or communications limits; this person must avoid entirely dangerous machinery and unprotected heights.

(Tr. 46).  The VE testified that the hypothetical person could perform work as an: (i) office

helper; (ii) mail clerk; or (iii) information clerk.  (Tr. 47).

The ALJ then posed a second hypothetical that kept all the same restrictions from the first

hypothetical but lowered the ability to stand/walk to only two hours out of an eight-hour

workday.  (Tr. 47).  The VE testified that such a hypothetical individual would be limited to

sedentary jobs and identified the following jobs they could perform: (i) document preparer;

(ii) charge accounts clerk; and (iii) telephone quotation clerk.  (Tr. 47-48).  Upon cross-

examination, the VE was asked whether the hypothetical person would be able to recline their

foot for about half of the workday at about six inches off the ground.  (Tr. 48).  The VE testified

that the hypothetical person could only perform the sedentary jobs he previously cited, not the

light jobs.  (Tr. 48).  Via's counsel asked about a two-foot elevation, and the VE stated:

> The issue with leg elevation, vocationally, is the person's ability to do seated or bench work, so in my opinion, based on my training and experience, a person could do seated or bench level work feet elevated, perhaps, no more than 90 degrees with six inches is -- is much below. Again, this individual would be able to perform light work for the jobs cited in hypo one or other light jobs.

(Tr. 48-49).  Finally, the VE testified that the hypothetical person could not be off task more than

10% of the time and could not incur more than one absence event per month (which included

arriving late or leaving early).  (Tr. 49).

### III.    The ALJ's Decision

At Step Four, the ALJ determined that Via had the residual functional capacity ("RFC") to perform work at a sedentary level except that he was further limited to:

> lifting or carrying 20 pounds occasionally and 10 pounds frequently; standing or walking for two hours and sitting for six hours of an eight-hour workday; constantly pushing or pulling; occasionally using foot pedal controls with right lower extremity; constantly using foot pedal controls with left lower extremity; occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; constantly stooping; frequently kneeling; occasionally crouching; frequently crawling; and never working around dangerous hazards or unprotected heights.

(Tr. 20).

In coming to this decision, the ALJ provided a summary of Via's subjective symptom complaints, as well as the medical evidence, and found that: (i) Via's statements concerning the intensity, persistence and limiting effects of these effects were not entirely consistent with the medical evidence; and (ii) a more restrictive RFC was unwarranted.  (Tr. 24-27).  The ALJ provided the following rationale:

> Overall, the record shows that the claimant's physical impairments did not result in the degree of functional limitation alleged by the claimant.  The claimant fractured his right foot.  He reported having significant pain and difficulty ambulating, using stairs, and handling activities of daily living.  Imaging showed moderate to severe deficits.  However, the record shows that his injuries occurred months before the alleged onset date.  Nevertheless, imaging showed intact hardware and no acute osseous injury.  He refused to get a new cast and he appeared to have some initial struggles with staying off his foot to allow it to heal ([Tr. 289, 291]).  Multiple exams showed no distress and no deficits with his extremities, gait, sensation, and strength.  He even denied having joint pain at times.  His symptoms improved with an injection.  He had a good prognosis with physical therapy.  He did not consistently use an assistive device or had an abnormal gait ([Tr. 353-354, 378, 382, 386, 440, 695, 765, 767, 780, 811]).  Regardless, the claimant has been limited to sedentary work with lifting or carrying 20 pounds occasionally and 10 pounds frequently; standing or walking for two hours and sitting for six hours of an eight-hour workday; constantly pushing or pulling; occasionally using foot pedal controls with right lower extremity; constantly using foot pedal controls with left lower extremity; occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; constantly stooping; frequently kneeling; occasionally crouching; frequently crawling; and never working around dangerous hazards or unprotected heights.  These limitations accommodate the claimant's physical impairments, including the exertional and postural and foot control limitations to accommodate

14

his pain and mobility issues, and the hazard limitations accommodating any radiating symptoms causing him from being unable to use right foot.  However, the record does not support further limitations.

(Tr. 27).

The ALJ found the opinions of the state agency medical consultants to be partially persuasive because they were: (i) consistent with the claimant needing postural and hazard limitations to accommodate his right foot injury; but (ii) the record justified limiting Via to only two hours of standing/walking per workday instead of the opined four hours.  (Tr. 27).  The ALJ found the opinion of PT Cecez to be somewhat persuasive – that Via was "capable of performing full-time 'medium' work, including standing for less than one and sitting for seven hours per workday, lifting between 30-50 pounds, and occasionally performing all postural movements except for avoiding walking and squatting and stair climbing along with frequently pinching." (Tr. 27).  The ALJ found the opinion only somewhat persuasive because: (i) it was provided nine months before the alleged onset date; (ii) PT Cecez's definition of medium work was inconsistent with SSA definitions; (iii) the record justified greater lifting and postural limitations; and (iv) the walking limitation was inconsistent with the testing for the functional capacity evaluation, which showed an ability to walk eight minutes without any assistance device and use of cane but no falls or use of orthotics.  (Tr. 27-28).

At the end of the Step Four analysis, the ALJ noted simply that Dr. Weaver had "opined in 2020 several times that the claimant was to be nonweightbearing and elevate his foot ([Tr. 289])."

IV.     **Law & Analysis**

A.     **Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this

standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.

*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance

of the evidence supports the claimant's position, the Commissioner's decision still cannot be

overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d

at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means

– and means only – 'such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the

court will not uphold that decision when the Commissioner failed to apply proper legal

standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own

regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of

a substantial right.").  And the court will not uphold a decision when the Commissioner's

reasoning does "not build an accurate and logical bridge between the evidence and the result."

*Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78

F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS

157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot

determine if it was discounted or merely overlooked.").

    At Step Four of the sequential evaluation process, the ALJ must determine a claimant's

RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e),

416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his

impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R.

§ 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the

[ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, and laboratory findings. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

**B.      Step Four – Whether the ALJ Properly Evaluated Dr. Weaver's Opinion**

Luksic's merits brief raises only one assignment of error: the ALJ did not properly evaluate the opinion of Dr. Weaver.  ECF Doc. 10 at 10-16.  Luksic first notes that Dr. Weaver opined that Via should elevate his foot at all times, and the ALJ acknowledged this as an opinion within in his decision.  *Id.* at 12.  She then argues that the ALJ erred because he failed to conduct any analysis of Dr. Weaver's opinion and was completely silent as to the persuasiveness, consistency, and supportability of the opinion.  *Id.* at 12-13.  Luksic argues that this error cannot be deemed harmless because the ALJ did not demonstrate that Dr. Weaver's opinion was patently deficient, and there was not enough discussion within the decision to determine whether it was harmless.  *Id.* at 13-14.  Finally, she argues that the ALJ failed to meet the minimum level of articulation required under the regulations and notes that Dr. Weaver's opinion is consistent with other record evidence.  *Id.* at 14-15.

The Commissioner notes that the ALJ failed to discuss the persuasiveness of Dr. Weaver's opinion and states that he should have evaluated the opinion pursuant to 20 C.F.R. § 404.1520c.  ECF Doc. 12 at 6.  The Commissioner then argues that this error does not require remand because: (i) the RFC makes it clear that the ALJ did not find the opinion fully persuasive; and (ii) it is clear why the ALJ discredited the opinion.  *Id.* at 7.  The Commissioner points to the record evidence demonstrating that Dr. Weaver's recommendation for non-weightbearing of Via's right foot was not a permanent restriction, and treatment notes indicated that it was only a short-term restriction – with evidence that Via demonstrated normal strength

17

and gait, and that he played golf.  *Id.* at 7-8.  Finally, the Commissioner argues that remand is not required in this case because remand would serve no useful purpose and would not change the result.  *Id.* at 8-9.

Luksic replies that the Commissioner's arguments: (i) amount to an improper *post hoc* rationalization of the evidence, (ii) are an invalid attempt to limit the court's review, and (iii) fail to address Luksic's arguments.  ECF Doc. 13 at 1-3.

An ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  An ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources."  20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, when evaluating the persuasiveness of medical opinions and prior administrative findings, an ALJ must, at a minimum, explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. §§ 404.1520c(b)(2), (c) (providing that an ALJ "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [the claimant's] case record.").

However, to trigger this particular duty of articulation, the alleged opinion must constitute a "medical opinion" under the regulations.  Social Security regulations draw a clear distinction between what constitutes a "medical opinion" versus what constitutes "other medical evidence," such as routine treatment notes.  The current regulations define a "medical opinion" as "a statement from a medical source about what [the claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant has] one or more impairment-related

limitations or restrictions" in the ability to perform physical, mental, and other demands of work activities and the ability to adapt to environmental conditions.  20 C.F.R. § 404.1513(a)(2). "Other medical evidence" is defined as "evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis."  *Id.* § 404.1513(a)(3).

The opinion Luksic points to appears in a June 10, 2020 treatment note of Dr. Weaver. *See* ECF Doc. 14 at 12-14; (Tr. 28, 289).  Even though the Commissioner's argument treats this instruction in a treatment note as a "medical opinion," the court is not convinced.  Dr. Weaver's treatment note indicated that Via was being treated for a closed nondisplaced fracture of the second metatarsal bone of the right foot with routine healing.  (Tr. 289).  Dr. Weaver stated that he wanted to place Via in a second fiberglass cast but Via refused and, against his better judgment and medical advice, he allowed Via to go forward using a pneumatic Cam walker. (Tr. 289).  Dr. Weaver recommended non-weightbearing and elevation of the right foot at all times.  *See* (Tr. 289).

This treatment note plainly does not constitute a "medical opinion" as defined in the regulations.  In context, this treatment note – and Dr. Weaver's recommendation for non-weightbearing and elevation of the right foot – were part of a course of treatment to help alleviate pain and allow the nondisplaced fracture in Via's foot to heal.  *See generally* (Tr. 274-315).  The treatment recommendations were not intended to express any opinion by Dr. Weaver as to what Via could or could not do on an ongoing basis with relation to his ability to work on a permanent basis.  Instead, they were short-term instructions to facilitate treatment and ensure that Via's foot healed properly.  Further highlighting the temporary nature of the treatment recommendations, Dr. Weaver's subsequent treatment notes, presumably after further healing, no

longer included recommendations for non-weightbearing and elevation of the right foot, but instead provided for a conservative course of treatment to include the use of orthotics, physical therapy, stretching, and mild strengthening exercises. *See* (Tr. 304, 307-308). Contrary to Luksic's contention, it is not entirely clear that the ALJ considered or treated Dr. Weaver's treatment instruction as an opinion. *See* ECF Doc. 10 at 12; (Tr. 28). After fully addressing and analyzing the medical opinions of the state agency medical consultants and PT Cecez, the ALJ simply acknowledged that Dr. Weaver had "opined in 2020 several times that [Via] was to be nonweightbearing and elevate his foot." (Tr. 28). Although this statement immediately followed the ALJ's analysis of other medical opinions, it would be odd and highly unlikely for the ALJ to have provided such thorough and proper analysis for all other medical opinions and then address a final medical opinion with no analysis whatsoever.

Regardless, Dr. Weaver's treatment recommendation was an advisement to Via, not an expression of a "medical opinion." *See Mark R. v. Comm'r of Soc. Sec.*, No. 1:21-CV-00080 CJS, 2023 U.S. Dist. LEXIS 38859, at *21-22 (W.D.N.Y. Mar. 8, 2023). Moreover, the treatment note did not include any statement or description as to what Via could still do despite his impairments, specifically in relation to work activities – a requirement under the regulations. *See* 20 C.F.R. § 404.1527(a)(1); *Mohssen v. Comm'r of Soc. Sec.*, Civil Action No. 12-14501, 2013 U.S. Dist. LEXIS 165782, at *25-26 (E.D. Mich. Oct. 28, 2013) ("[C]ourts have specifically drawn a distinction between a doctor's notes for purposes of treatment and a doctor's ultimate opinion on an individual's ability to work." (citing *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008)); *cf. Link v. Comm'r of Soc. Sec.*, No. 1:22-cv-01175, 2023 U.S. Dist. LEXIS 139658, at *31-32 (N.D. Ohio June 8, 2023) (finding that statements from a doctor in a disability benefits questionnaire that "work requiring heavy lifting and forceful repetitive back motions would not be recommended" and "work requiring prolonged standing

and walking would not be recommended" qualified as "medical opinions").  Under the regulations, Dr. Weaver's treatment note does not qualify as a "medical opinion."  *See., e.g.*, *Tina D. v. Comm'r of Soc. Sec.*, No. 3:22-cv-152, 2023 U.S. Dist. LEXIS 58829, at *13-16 (S.D. Ohio Apr. 3, 2023); *Crockett v. Saul*, No. 20-CV-992-SCD, 2021 U.S. Dist. LEXIS 114857, at *21-23 (E.D. Wis. June 21, 2021) (determining that a consultative report that provided orthopedic examination findings of a claimant, including the inability to bear full weight on her left ankle, did not constitute a "medical opinion" because it "did not provide a function-by-function assessment of [the claimant's] vocationally relevant functional limitations").

Because Dr. Weaver's treatment note, and its temporary treatment recommendation, did not constitute a medical opinion, the ALJ was not required to afford it any weight under the regulations and he did not err in failing to analyze its persuasiveness, supportability, and consistency or provide a more thorough analysis.  *See Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir.2007) (finding that a treatment note which provided no judgment about expected functioning did not qualify as "medical opinion" under the regulations); *Collins v. Comm'r of Soc. Sec.*, No. 1:20-cv-1587, 2021 U.S. Dist. LEXIS 188439, at *55-56 (N.D. Ohio June 21, 2021), *report and recommendation adopted*, 2021 U.S. Dist. LEXIS 18755- (N.D. Ohio June 21, 2021); *Arnett v. Comm'r of Soc. Sec.*, 142 F.Supp.3d 586, 592 n.5 (S.D. Ohio 2015) (determining that treatment notes did not qualify as a "medical opinion"); *Bulick v. Colvin*, Case No. No. 5:13 CV 1432, 2014 U.S. Dist. LEXIS 65668, 2014 WL 2003049, at *1 (N.D. Ohio May 13, 2014) (same).

**V.    Conclusion**

Because the ALJ applied proper legal standards in evaluating the medical records from

Dr. Weaver and the sole assignment of error is meritless, the Commissioner's final decision

denying Via's application for DIB is affirmed.

**IT IS SO ORDERED.**

Dated: March 22, 2024

Thomas M. Parker

United States Magistrate Judge